

## NUMBER 13-07-00342-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**MARCUS ANTHONY LOPEZ,** Appellant,

**v.**

**THE STATE OF TEXAS,** Appellee.

---

### On appeal from the 24th District Court
### of Victoria County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Vela**

A jury convicted appellant, Marcus Anthony Lopez, of engaging in organized criminal activity, a first-degree felony. *See* TEX. PENAL CODE ANN. § 71.02(a)(1), (b) (Vernon Supp. 2008). After finding that appellant had previously been convicted of one felony offense, the jury assessed punishment at life imprisonment. Appellant brings seven issues for our consideration. We affirm.

## I. Factual Background

At about 11:00 p.m. on April 24, 2005, Graviel Molina, a prospect[1] with the Texas Syndicate ("TS") gang in Victoria, Texas, was shot to death along Pleasant Green Road in Victoria County. That day, Molina had visited a friend, Angela Hernandez, at her apartment, and during this time he received a phone call from Joe Rosales, who was also a TS prospect. After talking to him, Molina left the apartment with Adrian Luna and Matthew Apis.

Captain Abel Arriazola, the lead investigator in this case, testified that prior to Molina's murder, someone had shot at Henry Vasquez's[2] car. Afterwards, the TS gang members in Victoria had a meeting during which Molina was questioned about whether he was passing information about TS's business to Vasquez. After the meeting, Molina got into a pickup with Luna and Apis. Appellant, James Martinez, Rosales, and Jesse Villarreal got into Martinez's car. They drove to Pleasant Green Road where appellant shot Molina four times, including once in the face at close range. Captain Arriazola stated that Martinez also shot Molina three times and that appellant ordered the killing.

James Martinez testified that in 2005, the TS members in Victoria were himself, Rosales, Villarreal, Vasquez,[3] Apis, Luna, and Molina. He stated they all sold narcotics for profit for TS. He also testified that Vasquez and Villarreal were "carnals"[4] and that

---

[1] A prospect is a person who wants to become a TS member.

[2] Henry Vasquez was once a member of TS in Victoria.

[3] Henry Vasquez was Graviel Molina's "padrino," that is, the person who was sponsoring Molina into the Texas Syndicate.

[4] "Carnals" are TS members who sponsor prospects into TS.

2

Vasquez was sponsoring Molina into TS. In early 2005, appellant, a carnal in TS, came to Victoria from Corpus Christi and talked to Villarreal and Rosales about a plan to improve TS in Victoria. The plan included greater discipline for TS members who violated TS's rules and the establishment of a treasury for the gang. On April 24, 2005, TS members decided to talk to Molina about whether he had met with and talked to Vasquez. After the decision was made to talk to Molina, Rosales called Molina and told him to come to a meeting. Apis and Luna picked up Molina at his girlfriend's apartment and took him to the meeting. After the meeting, Molina, Luna, and Apis got into Luna's pickup; appellant, Rosales, Martinez, and Villarreal got into Martinez's car. According to Martinez, they drove to Pleasant Green Road where appellant pulled Molina out of the pickup, held a nine millimeter pistol six inches from Molina's face, and shot him. Molina fell face down on the ground, and Martinez shot him three times in the back with a nine millimeter pistol. Martinez testified that the reason for Molina's murder was discipline and that carnals in TS can vote to kill a prospect, but prospects cannot vote to kill a prospect. He also testified the two carnals present at Molina's murder were appellant and Villarreal and that appellant was the highest ranking TS member present when Molina was killed.

Henry Vasquez, a former TS member, testified he was sponsoring Molina as a prospect for TS. Before January 2005, Vasquez was TS's "chair" or senior member in Victoria and held the rank of captain. While a captain, he was senior to Villarreal, who was a carnal. Vasquez testified he, Martinez, Villarreal, Rosales, Luna, Apis, and Molina sold narcotics for TS in Victoria. After Vasquez attended his last TS meeting in January 2005, the gang "demoted" him because he was no longer participating in TS. He testified appellant was a carnal in TS and came to Victoria from Corpus Christi. After arriving in

3

Victoria, appellant started making the decisions for TS in Victoria.[5]   Vasquez

[5] Specifically, on direct-examination, the prosecutor asked Henry Vasquez:

Prosecutor:    While you were still a [TS] member, before you were demoted, was there talk of improving the Texas Syndicate gang here in Victoria?

Vasquez:       Yes, sir.

Prosecutor:    Who was doing the talking?

* * * *

Vasquez:       Marcus Lopez [appellant]

* * * *.

Prosecutor:    Was he a member of the Texas Syndicate?

Vasquez:       Yes, sir.

* * * *

Prosecutor:    Was he a carnal?

Vasquez:       Yes, sir.

Prosecutor:    Any idea what rank he had?

Vasquez:       I think he was a sergeant when he came to Victoria.

* * * *

Prosecutor:    Once Marcus Lopez [appellant] came here [to Victoria], who made the decisions?

Vasquez:       He did.

Prosecutor:    What types of things did he [appellant] want to do to improve the Texas Syndicate?

Vasquez:       Tighten up security; get dope going here in Victoria, transactions; get everyone that was a prospect, get them fully membered, legit TS members.

Prosecutor:    When you tak about get security, I'm not sure I understand you. What do you mean?

Vasquez:       Well, tighten up security where, if there's any leaks, people that don't need to be around TS business either need to go or be taken out.

Prosecutor:    So no loose talking?

Vasquez:       No loose talking.

4

said appellant wanted to improve TS in Victoria by establishing a treasury and by tightening up security within the gang in order to prevent TS members from leaking information to persons who should not be hearing it. Vasquez testified this was a TS rule. In early April, the TS members in Victoria had a meeting. Vasquez testified that after this meeting, Molina warned him about a TS plot to kill Vasquez. Two days before Molina's murder, two masked men shot at Vasquez's car. Vasquez avoided the hit by ducking inside his car. He identified one of the would-be assassins as Villarreal because he recognized Villarreal's voice. Vasquez testified that appellant ordered Molina's murder for two reasons: (1) to improve the gang; and (2) because Molina had told Vasquez about the gang's plot to kill

---

Prosecutor: Well, that's an old-standing TS rule, isn't it?

Vasquez: Yes, sir.

\* \* \* \*

Prosecutor: Well, taken out, is that a date or . . .

Vasquez: No, no, that's to be—have a hit on him, to be taken out by death.

\* \* \* \*

Prosecutor: Before they tried to assassinate you had you ever met with Marcus Anthony Lopez?

Vasquez: Twice. . . .

Prosecutor: And did he tell you anything about a plan to improve the gang?

Vasquez: The second time I talked to him.

Prosecutor: What did he say?

Vasquez: He said he wanted to reconstruct TS here and get things rolling like it's supposed to be and tighten up security and do the job that I wasn't doing.

5

Vasquez.[6]  Vasquez testified that an active TS member is not supposed to talk about TS business with an inactive member or with one who has disassociated himself from the gang.  He also testified that in this case, Molina's act of talking to him would have been a violation of that rule.

---

[6] Specifically, on direct-examination, the prosecutor asked Henry Vasquez:

Prosecutor: In April of 2005 if all those people except for yourself was [sic] present at a killing of Gabriel [sic] Molina, could Gabriel—or Graviel Molina have been killed without the permission or orders of Marcus Anthony Lopez?

Vasquez: No, sir.

\* \* \* \*

Prosecutor: On April 24th, 2005, who could give orders that everybody else in Victoria in the Texas Syndicate would have to follow?

Vasquez: Marcus Anthony Lopez.

Prosecutor: Even if Marcus Anthony Lopez did not pull the trigger, if everybody there was at Graviel Molina's killing, who gave the order for the killing?

Vasquez: Marcus.

\* \* \* \*

Prosecutor: Were they killing him to improve the gang here in Victoria?

Vasquez: Yes, sir.

\* \* \* \*

Prosecutor: How could it be, in an organization with rules and with rank, that anybody else could have killed Graviel Molina in the presence of Marcus Anthony Lopez if Marcus Anthony Lopez did not want it to happen?  Could it happen?

Vasquez: No, sir.

Prosecutor: So if it happened, who is in charge of it happening?

Vasquez: Who made the call?

Prosecutor: Yes, sir.

Vasquez: Marcus.

6

The autopsy showed Molina died from multiple gunshot wounds. He was shot three times in the back, once in the face, and three times in the chest. Dr. Roberto Bayardo, who performed the autopsy, testified he had recovered one bullet from Molina's body—a nine-millimeter bullet that had penetrated Molina's face. He said the three bullets that penetrated Molina's back exited the body. Based upon the wounds and crime-scene photos, Dr. Bayardo believed Molina was first shot in the face. Molina "went down" and at that time suffered three gunshot wounds to the chest. While on the ground, Molina was shot three times in the back.

Investigators recovered seven spent nine millimeter shell casings from the crime scene. Two bullets were found in the ground underneath Molina's body and another bullet was found nearby. Carol Hulsey, a deputy with the Victoria County Sheriff's Department, testified that four of the shell casings were fired from one weapon and that the other three shell casings were fired from a different weapon. The weapons were never recovered.

Tim Counce, a forensic firearms and tool-mark examiner with the Texas Department of Public Safety crime lab, examined the seven spent nine-millimeter shell casings, the three bullets recovered from the scene, and the bullet recovered from Molina's body. He prepared a report,[7] which showed, in relevant part that: (1) four of the spent nine-millimeter shell casings were fired from one weapon, and the other three spent nine-millimeter shell casings were fired from a different weapon; and (2) two of the nine-millimeter bullets were fired from one weapon, and two of the other nine-millimeter bullets were fired from a different weapon.

---

[7] The trial court admitted this report into evidence as State's exhibit 105.

Jay Hart, a Regional Security Threat Group Coordinator for the Texas Department of Criminal Justice, testified he assisted with the investigation of gang activity and that he was familiar with the identifiers and the inner workings of TS. He stated: (1) TS had a defined structure and a written constitution; (2) TS was a prison gang, which operated outside the prison system; (3) TS engaged in drug trafficking and murder outside the prison system; (4) TS engaged in these activities for profit; and (5) the highest rank within TS is chairman, followed by lieutenant, sergeant, soldiers, which are considered either "brothers" or "carnals," and then prospects. He also testified that if, after three years, a TS prospect did everything the full members told him to do, the membership will vote on whether to admit the prospect as a full member. TS's application process is speeded up if a prospect assaults somebody or kills somebody. Once a person joins TS, "they consider blood in, blood out, meaning death would be the only way out." If a member violates a rule, he is targeted for assault or death. He said most TS members have an identifying tattoo—a "T" with an "S" superimposed behind it.

Appellant did not call any witnesses to testify on his behalf at the guilt-innocence phase.

## II. DISCUSSION

### A. Corroboration of Accomplice-Witness Testimony

We address issue two first. Therein, appellant argues there was insufficient evidence to corroborate the testimony of the accomplice witness, Martinez.

#### 1. The Accomplice-Witness Rule

The accomplice-witness rule provides that, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the

8

defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005); *see Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The court of criminal appeals has described this rule as "a statutorily imposed review" that "is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). We evaluate the "sufficiency of corroboration evidence under the accomplice-witness rule" by first eliminating the accomplice's testimony from consideration and then examining the remainder of the record for non-accomplice witness "evidence that tends to connect the accused with the commission of the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). In applying this standard, we view the evidence in the light that most favors the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)).

We have said that "[t]he tends-to-connect standard presents a low hurdle for the State." *Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.–Corpus Christi 2006, pet. ref'd). "We consider the combined weight of the non-accomplice evidence, even if [that evidence] is entirely circumstantial." *Claxton v. State*, 124 S.W.3d 761, 765 (Tex. App.–Houston [1st Dist.] 2003, pet. ref'd). The court of criminal appeals has said that "[t]he non-accomplice evidence need not be sufficient in itself to establish the accused's guilt beyond a reasonable doubt. Nor is it necessary for the non-accomplice evidence to directly link the accused to the commission of the offense." *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997) (citation omitted). Further, the court of criminal

9

appeals has noted that "unlike extrajudicial confessions, testimony of an accomplice need be corroborated only as to facts 'tending to connect the defendant with the offense committed' and not as to the corpus delicti[8] itself." *Castillo*, 221 S.W.3d at 691 (quoting *Gribble v. State*, 808 S.W.2d 65, 71 n.13 (Tex. Crim. App. 1990)).

Sometimes, insignificant circumstances afford the most satisfactory evidence of guilt and corroboration of the accomplice-witness's testimony. *Patterson*, 204 S.W.3d at 860. "In applying the test of the sufficiency of the corroboration, each case must be considered on its own facts and circumstances." *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). "Independent evidence [that] generally tends to prove that an accomplice witness's version of events is true, rather than the [defendant's version], is considered corroborative, even if it concerns a mere 'detail,' as opposed to a substantive link between the defendant and commission of the offense." *Beathard v. State*, 767 S.W.2d 423, 430 (Tex. Crim. App. 1989). "The corroborating evidence may be [either] circumstantial or direct." *Reed*, 744 S.W.2d at 126; *Granger v. State*, 683 S.W.2d 387, 392 (Tex. Crim. App. 1984). Because each case must rest on its own facts, corroboration does not require a set quantum of proof. *Malone*, 253 S.W.3d at 257. "The accomplice witness rule is satisfied if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Hernandez*, 939 S.W.2d at 176 (emphasis in original).

---

[8] The corpus delicti of murder is established if the evidence shows the death of a human being caused by the criminal act of another. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

10

*2. Sufficiency of Independent Evidence to Corroborate Martinez's Accomplice-Witness Testimony*

*a. Commission of Molina's Murder*

The autopsy showed Molina died from multiple gunshot wounds. Thus, the evidence independent of the accomplice witness showed someone murdered Molina. Evidence showing the commission of the offense charged is a factor to be considered along with other factors in determining whether sufficient independent evidence exists to corroborate the accomplice-witness testimony. *Paulus v. State*, 633 S.W.2d 827, 845 (Tex. Crim. App. 1982).

*b. Motive*

Hart testified TS membership is for life. Once a person joins, "they consider blood in, blood out, meaning death would be the only way out." If a member violates a rule, he is targeted for assault or death. Vasquez testified that after appellant came to Victoria, appellant began making the decisions for the TS gang in Victoria. One of his decisions was to "tighten up security" and "build a treasury." After the gang hatched a plot to murder Vasquez, Molina warned Vasquez about the plot, thereby violating a TS rule that could result in TS disciplining Molina by death. Thus, appellant had a motive to order and take part in Molina's murder. This evidence corroborated Martinez's testimony that Molina was killed for disciplinary reasons. Even though evidence that merely goes to show motive of the accused to commit the crime is insufficient alone to corroborate the accomplice-witness testimony, it may, however, be considered in connection with other evidence tending to connect the accused with the crime. *Reed*, 744 S.W.2d at 127. Accordingly, we may consider this evidence in connection with all other evidence tending to connect appellant

11

to Molina's murder. *See Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993) (explaining that "ill feelings" toward the victim is suspicious circumstance that tends to connect the accused to the crime in order to furnish sufficient corroboration to support conviction).

### c. Forensic Evidence

The evidence showed that seven spent nine-millimeter shell casings recovered from the crime scene were fired from two different nine-millimeter weapons. Likewise, the four recovered bullets were fired from two different nine-millimeter weapons. This evidence corroborated Martinez's testimony that he and appellant each used a nine-millimeter weapon to shoot Molina. Dr. Bayardo testified Molina had three gunshot wounds to his back. This corroborated Martinez's testimony that he shot Molina three times in the back. Dr. Bayardo stated the bullet that penetrated Molina's face entered one-half inch to the left of his mouth and that "based upon the heavy gunpowder burning around the entrance wound," the bullet was fired from a gun "approximately six inches from Molina's face." These details corroborated Martinez's testimony that appellant held the weapon "[s]ix inches" from Molina's face and shot him in the face, "somewhere by the mouth. . . ." Dr. Bayardo recovered the bullet that penetrated Molina's face and testified this bullet was "a nine-millimeter" bullet. This detail corroborated Martinez's testimony that appellant shot Molina in the face with a nine-millimeter gun. Thus, the medical and ballistics evidence corroborated Martinez's testimony.

### d. Appellant's Participation in Molina's Murder

Vasquez testified Molina could not have been killed without the permission or orders of appellant and that appellant gave the order to kill Molina. Vasquez said Molina's murder

could not have happened if appellant did not want it to happen. The evidence that appellant was directing the other TS members in Victoria is some evidence that tends to connect appellant to the murder. *United States v. Abrego*, 141 F.3d 142, 157-58 (5th Cir. 1998). [9]

### e. Other Corroborative Evidence

Molina's friend, Angela Hernandez, testified that on the day of Molina's murder, Rosales called Molina to tell him about a meeting and that Luna and Apis came by to pick up Molina. This corroborated Martinez's testimony that on April 24, 2005, Rosales called Molina to tell him to come to a meeting and that Luna and Apis picked up Molina to take him to the meeting. Vasquez's testimony corroborated Martinez's testimony that: (1) appellant and Villarreal were members of TS and carnals in the gang; (2) Vasquez was sponsoring Molina into TS; (3) appellant came to Victoria from Corpus Christi; (4) appellant wanted to improve TS in Victoria; (5) TS members in Victoria were involved in the sale of narcotics; (6) part of the plan to improve TS in Victoria included building up the gang's treasury; (7) Vasquez had been shot at during the week Molina was murdered; (8) there was a concern amongst the TS members about Molina talking to Vasquez; and (9) Molina was "disciplined" on April 24, 2005.

---

[9] *See also Mendoza v. State*, No. 13-06-119-CR, 2008 WL 1822531, at *4 (Tex. App.–Corpus Christi Apr. 24, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that non-accomplice evidence that defendant was the local HPL gang leader and the only person that could have ordered the shooting tends to connect defendant to the offense); *Gallardo v. State*, No. 04-06-00057-CR, 2007 WL 2116418, at *7 (Tex. App.–San Antonio July 24, 2007, no pet.) (mem. op., not designated for publication) (holding that non-accomplice evidence that defendant, a Mexican Mafia gang member, who was directing the actions of other Mexican Mafia gang members, is some evidence that tends to connect the defendant as a party to the kidnaping and murder of the two victims).

13

Considering the combined weight of the non-accomplice evidence, we conclude the State met its burden to provide some evidence that tends to connect appellant to Molina's murder and to the associated organized criminal activity. Accordingly, we hold the State presented sufficient non-accomplice corroborating evidence to support Martinez's testimony as required by article 38.14. Issue two is overruled.

B. *Legal and Factual Sufficiency of the Evidence to Support the Conviction*

In issue one, appellant challenges the legal and factual sufficiency of the evidence to support his conviction. The standards of review applicable to issues concerning the legal and factual sufficiency are well settled and need not be repeated. Instead, we refer the parties to *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and *Sanchez v. State*, 275 S.W.3d 901, 902 n.2 (Tex. Crim. App. 2009) for the legal sufficiency standard and to *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) and *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) for the factual sufficiency standard.

Appellant argues the evidence is insufficient to show: (1) he was a member of a criminal street gang or of a combination; (2) he committed the murder of Molina; or (3) he conspired to murder Molina. We separately address each assertion.

*1. Engaging in Organized Criminal Activity*

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately

14

describes the  particular offense for which the defendant was tried.  *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik*, 953 S.W.2d at 240.  A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit . . . murder."  TEX. PENAL CODE ANN. § 71.02(a)-(a)(1).

Section 71.01 defines "combination" as "three or more persons who collaborate in carrying on criminal activities. . . ."  *Id*. § 71.01(a) (Vernon 2003).  A "criminal street gang" is defined as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities."  *Id*. § 71.01(d).  "Conspires to commit" means that:

> a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement.  An agreement constituting conspiring to commit may be inferred from the acts of the parties.

*Id*. § 71.01(b).

The underlying offense in this case was the murder of Molina.  A person commits murder if he or she "intentionally or knowingly causes the death of an individual."  *Id*. § 19.02(b)(1) (Vernon 2003).  Intent can be inferred from the defendant's acts, words, and conduct.  *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Lee v. State*, 964 S.W.2d 3, 8 (Tex. App.–Houston [1st Dist.] 1997, pet. ref'd).

The charge included an instruction on the law of parties.  A person is "criminally responsible as a party to an offense if the offense is committed by his own conduct, by the

conduct of another for which he is criminally responsible, or by both." *Id*. § 7.01(a) (Vernon 2003). A person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b).

While the presence of an accused at the scene of an offense is not sufficient by itself to support a conviction, "it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant." *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987). Furthermore, "participation in an enterprise may be inferred from circumstances and need not be shown by direct evidence." *Id*. at 684.

*2. Analysis*

*a. Sufficiency of the Evidence to Support Appellant's Intent to Participate as a Member of a Criminal Street Gang*

Hart testified that TS had a common identifying sign or symbol and an identifiable leadership. The evidence showed appellant and other persons who participated in Molina's murder were TS members. After Vasquez was demoted as TS's chair, appellant made the decisions for TS in Victoria. The TS members in Victoria regularly associated in the commission of criminal activities such as the trafficking of narcotics, the plot to kill Vasquez, and the murder of Molina. Thus, a rational jury could conclude appellant was a member of a criminal street gang. *See* Tex. Penal Code Ann. § 71.01(d) (defining "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the

16

commission of criminal activities").

*b. Sufficiency of the Evidence to Support Appellant's Intent to Establish, Maintain, or Participate in a Combination*

The evidence showed that appellant and the other TS members left their meeting, took Molina to Pleasant Green Road, and then appellant and Martinez shot him. The reason for Molina's murder was to discipline him thereby improving TS in Victoria. The evidence also showed that appellant, who was making the decisions for TS in Victoria, was involved in promoting narcotics trafficking in Victoria, tightening up discipline within the gang, and that the TS members in Victoria sold narcotics for profit. Thus, a rational jury could have concluded appellant participated in a combination when he shot Molina. *See id*. § 71.01(a) (defining a combination as "three or more persons who collaborate in carrying on criminal activities").

*c. Sufficiency of the Evidence to Show Appellant Murdered Molina*

A rational jury could have determined the following from the evidence: (1) appellant was making the decisions for TS in Victoria at the time of Molina's murder; (2) Molina was a prospect with the TS; (3) Vasquez had disassociated himself from TS; (4) TS rules forbade its members from leaking information about its business to persons who had disassociated themselves from the gang; (5) a penalty for violating this rule is death; (6) Molina violated this rule by warning Vasquez about a TS plot to kill Vasquez; (7) Martinez saw appellant shoot Molina in the face at close range with a nine-millimeter weapon; (8) a nine-millimeter bullet that had penetrated Molina's face was recovered from his body; (9) Dr. Bayardo's testimony showed the bullet that penetrated Molina's face was fired at close range.

*d. Sufficiency of the Evidence to Show Appellant Conspired to Murder Molina*

The evidence showed that prior to Molina's murder, appellant and the other TS members in Victoria met for the purpose of questioning Molina about whether he spoke to or met with Vasquez. After this meeting, all of the members went to Pleasant Green Road where appellant and Martinez killed Molina. The evidence also showed that appellant ordered Molina's murder. A rational jury could infer from these facts that appellant agreed with one or more of the TS members in Victoria to engage in conduct that would constitute the offense and that one of these members performed an overt act in pursuance of the agreement. *See id*. § 71.01(b) (defining "conspires to commit"as a person agreeing with one or more persons that any one of them engage in conduct constituting the offense and one of them performing an overt act in pursuance of the agreement).

Evidence militating in favor of appellant showed that: (1) no murder weapons were found; (2) no physical evidence connected appellant to Molina's murder; (3) Martinez had an "agreement" with the State that if he testified, he would receive two concurrent twenty-year sentences for "engaging in organized crime" and for murder; (4) Martinez testified in court that his shooting Molina could elevate his status with TS; (5) Martinez had a prior theft conviction; (6) Vasquez had been on parole for burglary of a habitation and aggravated assault; (7) Martinez was a prospect with TS; and (8) Hart testified that TS's application process is speeded up if a prospect kills somebody.

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty of engaging in organized criminal activity beyond a reasonable doubt. Viewing the evidence neutrally, we conclude the evidence supporting the conviction is not so weak that the jury's

18

determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. We hold the evidence is factually sufficient to support the conviction. Issue one is overruled.

*C. Exclusion of Evidence*

In issue three, appellant argues the trial court erred in refusing to allow him to offer evidence on the issue of former jeopardy. Appellant has not provided accurate record references showing that the trial court excluded evidence of former jeopardy. To preserve an issue for appellate review, "the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(h), *see McFarland v. State*, 928 S.W.2d 482, 512 (Tex. Crim. App. 1996) (issues that lack citation to the record are waived). Thus, appellant, having failed to support his argument on this issue with references to the record, has waived this complaint. *See* TEX. R. APP. P. 38.1 (h); *Perez v. State*, 261 S.W.3d 760, 765 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd).

By this same issue, appellant argues double jeopardy barred his prosecution in Victoria County because a Nueces County grand jury had previously indicted him for Molina's murder. In October 2005, a Nueces County grand jury indicted appellant for engaging in organized criminal activity (capital murder)[10]. On March 16, 2006, appellant was reindicted under the same cause number in Nueces County. Pursuant to the State's motion to dismiss on December 8, 2006, the 319th District Count of Nueces County signed

---

[10] The Nueces County indictment charged appellant with engaging in organized criminal activity (capital murder) "by causing the death of GRAVIEL MOLINA on April 24, 2005, by shooting him with a firearm in Victoria County, Texas, and pursuant to the same course of conduct and scheme, did cause the death of JAVIER LARA by shooting him with a firearm on May 18, 2005 in Nueces County, Texas, . . . ."

19

an order dismissing that case.

*1. Applicable Law*

The Double Jeopardy Clauses of the United States and Texas Constitutions provide that no person shall be twice put in jeopardy for life or liberty for the same offense. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 14. Double jeopardy protects persons from: (1) "a second prosecution for the same offense after acquittal[;]" (2) "a second prosecution for the same offense after conviction[;]" and (3) "multiple punishments for the same offense." *Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006). "There can be no double jeopardy unless the [accused] has been previously placed in jeopardy." *Scholter v. State*, 691 S.W.2d 84, 87 (Tex. App.–Houston [1st Dist.] 1985, pet. ref'd). The defendant bears the burden to come forward with evidence in support of a double-jeopardy allegation. *Anderson v. State*, 635 S.W.2d 722, 725 (Tex. Crim. App. 1982).

With respect to the Texas and federal double jeopardy clauses, jeopardy attaches in a jury trial when the jury is impaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 38 (1978); *State v. Torres*, 805 S.W.2d 418, 420 (Tex. Crim. App. 1991). "In Texas[,] jeopardy attaches in a bench trial when the defendant pleads to the indictment." *Ortiz v. State*, 933 S.W.2d 102, 105 (Tex. Crim. App. 1996).

Subject to the trial court's consent, the State is free to dismiss a criminal action at any time. *See* TEX. CODE CRIM. PROC. ANN. art. 32.02 (Vernon 2006). However, depending on the timing of the State's motion to dismiss, the Fifth Amendment may bar a subsequent prosecution following dismissal of the charging instrument. *See Brown v.*

20

*State*, 900 S.W.2d 805, 807 (Tex. App.–San Antonio 1995, pet. ref'd). "If a charge is affirmatively abandoned or dismissed with the trial court's permission *before* jeopardy attaches, then the [State] is free to press that charge at a later time." *Proctor v. State*, 841 S.W.2d 1, 4 (Tex. Crim. App. 1992) (emphasis in original). On the other hand, if the State dismisses a charging instrument after jeopardy has attached, it may not thereafter prosecute the accused for that offense for which he or she was earlier placed in jeopardy of conviction. *See Ex parte Goodman*, 152 S.W.3d 67, 71 (Tex. Crim. App. 2004). In that event, "the State loses the opportunity to try that charge forever." *Brown*, 900 S.W.2d at 807.

*2. Analysis*

The question is whether appellant, at the time the 319th District Court granted the State's motion to dismiss the case in Nueces County, had already been placed once in jeopardy, thereby prohibiting further prosecution for that offense in Victoria County. After the jury was impaneled and sworn for the case[11] in Victoria County, the trial court stated, "[Defense counsel], your Defendant's Exhibit C is a Motion to Dismiss filed by the State of Texas that completely dismisses Indictment Number 05-CR-3106-G [in Nueces County] against Marcus Lopez [appellant]. Mr. Lopez has never been tried for any of those matters." To this, defense counsel replied, "That's correct, Your Honor." The record does not reflect, and appellant does not argue, that he pleaded to the indictment in Nueces County before it was dismissed, or that a jury was empaneled and sworn in that cause before the indictment was dismissed. Thus, we conclude that appellant's case in Nueces

---

[11] With respect to appellant's case in Victoria County, the appellate record shows the jury was impaneled and sworn on May 18, 2007.

County was affirmatively dismissed with the court's permission on December 8, 2006 before jeopardy attached. Accordingly, we hold appellant's prosecution in Victoria County was not barred by double jeopardy. Issue three is overruled.

*D. Effective Assistance of Counsel*

In issue four, appellant argues he was denied his right to effective assistance of counsel. *See* U.S. CONST. amend. VI.

*1. Standard of Review*

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test for evaluating effective-assistance-of-counsel claims. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009). To obtain a reversal of a conviction under the *Strickland* test, an accused "must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding." *Id*. (citing *Strickland*, 466 U.S. at 688). The second prong of the *Strickland* test is generally met by showing there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. (citing *Strickland*, 466 U.S. at 692).

*2. Analysis*

Appellant raises ten complaints concerning his counsel's ineffectiveness. We group them into seven categories.

*a. Jury Selection*

Appellant complains that during voir dire examination, defense counsel failed to strike two jurors who appellant contends admitted to having a bias against appellant. A

juror is biased when an "'an inclination toward one side of an issue rather than to the other . . . leads to the natural inference that [the juror] will not or did not act with impartiality.'" *Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982) (quoting *Compton v. Henrie*, 364 S.W.2d 179 (Tex. 1963)). In determining whether a juror is prejudiced, we look to the totality of the prospective juror's responses concerning his or her qualifications to serve. *See Porter v. State*, 623 S.W.2d 374, 377 (Tex. Crim. App. 1981). Here, the totality of the responses by juror 1 (name withheld)[12] and juror 2 (name withheld)[13]

---

[12] During individual voir dire examination, the trial court asked juror 1:

| Court: | [I]n your opinion can you, . . . sit on this jury, . . . and listen to the evidence . . . from the witness stand and consider only that evidence and any exhibits that may be entered into evidence in making a determination about the guilt or innocence of the accused and then make . . . a determination about what punishment, if any, should be assessed to the accused. . . . ?" |
|---|---|
| Juror 1: | Yes, sir. But the stipulation to that, in my opinion, being if there was a witness I would have, you know, as far as a gang member. Like I said, to my beliefs, once they're in a gang I think that they're going to stick to and try to, you know, say what they think is right, you know, towards the gang, because I don't know what they've changed, you know, what they're up here or not. I'd have trouble making a decision and believing them and what they say. But I guess that's what the jury is up here for, to see if the witness is saying the right stuff. |

\* \* \* \*

| Court: | Can you listen to the evidence and weigh that evidence in light of all the evidence that's admitted that everybody says, whether gang members or non-gang members, and see what seems most reasonable and credible, make a decision about the credibility of the witnesses and render a decision based on that evidence? |
|---|---|
| Juror 1: | Yes, sir. |

[13] During individual voir dire examination, the prosecutor, defense counsel, and trial court asked juror 2 the following questions:

| Prosecutor: | All right. Well, the fact that somebody you once had a relationship with and had a child by was a member of a street or prison gang— |
|---|---|
| Juror 2: | Yeah. |
| Prosecutor: | —would that affect you if you were a juror in making a decision first as to credibility of witnesses who are alleged to be members or past members or |

do not show a bias against appellant.

|  |  |
|---|---|
|  | associates of street or prison gangs? |
| Juror 2: | No, it really wouldn't. |
|  | * * * * |
| Prosecutor: | You said you can judge the credibility of a past— |
| Juror 2: | Yes. |
| Prosecutor: | —or present member of a gang. |
| Juror 2: | Uh-huh. |
|  | * * * * |
| Prosecutor: | But can you do it based only on the evidence the judge allows in and the law he provides, none of your personal experience? |
| Juror 2: | Yes. |
|  | * * * * |
| Defense: | Juror 2, do you—are you sure in your own mind and heart, in that little voice inside, do you think you could sit through a week of trial and not be influenced by these outside matters that you have personal knowledge of when deciding this case? Would you not bring all of that baggage with you when you're sitting there listening? |
| Juror 2: | I want to say I can, but I'm not too sure, to be honest with you. I can say yes, but when it comes down to it I can't, I don't know if I can. |
|  | * * * * |
| Court: | I think what we need to know is will you not convict him in your mind based on your past experiences until all the evidence is in and you can hear what evidence the State has to present, because you may be convinced at the end of that evidence that he has no involvement in anything. |
| Juror 2: | Yes, sir, I can. |
| Court: | If that's what you believe, will you vote that way? |
| Juror 2: | Yes, sir. |
|  | * * * * |
| Court: | Can you listen to the evidence and weigh that evidence in light of all the evidence that's admitted that everybody says, whether gang members or non-gang members, and make a decision about the credibility of the witnesses and render a decision based on that evidence? |
| Juror 2: | Yes, sir. |

Next, appellant argues defense counsel was ineffective for failing to obtain a ruling on his motion to challenge the jury array. Appellant claims this error was prejudicial because only one Hispanic-surnamed juror was seated on the jury. To satisfy the Sixth Amendment right to a jury trial, the jury must be chosen from a panel representing a "fair cross-section of the community." *Duren v. Missouri*, 439 U.S. 357, 359 (1979). In *Pondexter v. State*, the court instructed that to establish a prima-facie violation of this requirement, an accused "must show: (1) the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process." 942 S.W.2d 577, 580 (Tex. Crim. App. 1996). Here, appellant arguably has met the first prong; i.e., the group alleged to be excluded is a "distinctive" one within the community. However, appellant has failed to meet the remaining prongs. The record does not show the racial composition of the panel. Even though only two Hispanic-surnamed jurors were seated on the jury, there is nothing to show the requisite "systematic exclusion" of that racial group in Victoria County. Surnames alone do not establish a person's race. A disproportionate representation in a single jury panel[14] is not sufficient to demonstrate an unconstitutional systematic exclusion of distinctive racial groups. *Id.* at 581.

Third, appellant argues trial counsel was ineffective for failing to assert a *Batson*[15] challenge. "There must be some evidence to establish that counsel's failure to challenge

---

[14] The jury list shows that out of thirty-seven potential jurors, eleven have Hispanic surnames.

[15] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

25

the State's strikes [amounted] to deficient performance and that the defendant was prejudiced when alleged *Batson* error was not preserved." *Tijerina v. State*, 921 S.W.2d 287, 289 (Tex. App.–Corpus Christi 1996, no pet.). We presume the jury selected was impartial. *Batiste v. State*, 888 S.W.2d 9, 16 (Tex. Crim. App. 1994). Here, the list of thirty-seven potential jurors included eleven persons with Hispanic surnames. Both sides struck one Hispanic-surnamed juror for cause, and both sides agreed to strike a second Hispanic-surnamed juror. Defense counsel struck one Hispanic-surnamed juror, and the State struck four other Hispanic-surnamed jurors. Two Hispanic-surnamed jurors were seated on the jury. There is no evidence to show that defense counsel's failure to voice a *Batson* objection was not based on his sound professional judgment or that a *Batson* violation, if any, prejudiced the trial. There is simply no evidence to overcome the presumption that counsel performed adequately. *See Tijerina*, 921 S.W.2d at 289 (concluding record did not support ineffective assistance claim for failure to make *a Batson* challenge).

Thus, with respect to jury selection, appellant has not shown defense counsel's performance fell below an objective standard of reasonableness nor has he shown a reasonable probability exists that, but for counsel's alleged errors, the result would have been different. *See Strickland*, 466 U.S. at 687-88.

*b. Failure to Object to the Admission of Tim Counce's Report*

Appellant argues defense counsel was ineffective for failing to object "to the late filing of [Tim Counce's] report as it clearly violated the terms of the Discovery Agreement." Prior to the State calling Counce as a witness, defense counsel objected to the report on the grounds that it was: (1) "untimely and . . . as such, it's a violation of the open file policy

26

of discovery"; (2) "in violation of my discovery motion, . . . ."; and (3) "in violation of the due process, fair play required under mutual discovery. . . ."  The trial court overruled the objections. During Counce's direct-examination, the State offered the report into evidence. At that point, defense counsel told the trial court, "I've made my previous objections to the report so...."  The trial court overruled the objections and admitted the report into evidence. Even though counsel did not specifically object that the admission of the report into evidence violated the discovery agreement, counsel's objections made the trial court aware the report was untimely.  Thus, appellant has failed to show that counsel's performance fell below an objective standard of reasonableness.  Furthermore, appellant has failed to show there is a reasonable probability that, but for counsel's failure to specifically object to the report on the basis it violated the discovery agreement, the result of the trial would have been different.  *See Strickland*, 466 U.S. at 694.

*c. Failure to Employ Investigators and Experts*

Appellant argues defense counsel was ineffective for failing "to employ any expert or private investigator to investigate this case or to locate witnesses. . . ."[16]  When assessing the reasonableness of counsel's investigation, we "must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)).  "'[C]ounsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.  [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

---

[16] Appellant does not say what witnesses either were available or could have been located.

27

of deference to counsel's judgment.'" *Id.* (quoting *Wiggins*, 539 U.S. at 522-23). "If counsel's reasons for his conduct do not appear in the record, and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007). Here, defense counsel's reason for failing to employ experts and investigators does not "appear in the record, and his conduct could have been part of a reasonable trial strategy. Without more, we must defer to counsel's decisions and deny relief." *Id.* Even assuming counsel's failure to employ experts and investigators amounted to deficient performance, appellant has failed to show there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694.

*d. Failure to Object to the Admission of a Videotape and to Captain Arriazola's Testimony*

Appellant argues defense counsel was ineffective for allowing Captain Arriazola to testify, without objection, "to numerous facts which were mere speculation and conjecture on his part." Appellant has not provided record references showing what portions of Captain Arriazola's testimony constituted speculation and conjecture. To preserve an issue for appellate review, "the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i), *see McFarland*, 928 S.W.2d at 512 (holding issues that lack citation to the record are waived). Thus, appellant, having failed to support his argument on this issue with references to the record, has waived his complaint on this issue. *See* TEX. R. APP. P.

28

38.1 (i); *Perez,* 261 S.W.3d at 765.

Next, appellant argues defense counsel was ineffective for failing to voice a hearsay objection to Captain Arriazola's testimony. During the investigation of this case, Apis, Luna, Rosales, and Villarreal provided statements or admissions to Captain Arriazola about what they knew about the murder. Captain Arriazola's testimony about the events surrounding the murder was based on these statements and admissions. Appellant also argues trial counsel was ineffective for failing to object to the admission of a videotape from a security camera at a Circle K store near Angela Hernandez's apartment. The videotape showed Apis and Luna at the store on the evening of the murder. Appellant argues the videotape was inadmissible because the State failed to have an agent from Circle K to establish the "proper predicate" for admission of the videotape.

Because the record does not mention counsel's reasons for not objecting to either the videotape or to the hearsay portions of Captain Arriazola's testimony, appellant has failed to rebut the strong presumption that defense counsel acted within the range of reasonable professional assistance. *See Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd) (holding that when record contains no evidence indicating why defense counsel engaged in the conduct of which the defendant now complains, defendant has not overcome the strong presumption that defense "counsel acted within the range of reasonable professional assistance") (citing *Strickland*, 466 U.S. at 687); *see also Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984) (holding that trial counsel's failure to object to improper evidence may be presumed to be reasonable trial strategy and does not constitute ineffective assistance of counsel); *Darby v. State*, 922 S.W.2d 614, 623-24 (Tex. App.–Fort Worth 1996, pet. ref'd) (holding defense

29

counsel's decision not to object to "inadmissible hearsay is . . . justifiable as sound trial strategy"). Even assuming counsel's failure to object to either the videotape or to the hearsay constituted deficient performance, appellant has failed to show there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694. We note that Hernandez, Martinez, and Vasquez testified with respect to the events surrounding the murder. *See Maranda v. State*, 253 S.W.3d 762, 769 (Tex. App.–Amarillo 2007, pet. ref'd) (holding the improper admission of hearsay evidence "does not constitute reversible error if the same facts are proved by other, properly admitted evidence").

*e. Failure to Obtain Reports from the FBI*

Appellant argues defense counsel was ineffective for failing to obtain the FBI reports and other exculpatory information.[17] During cross-examination, Captain Arriazola testified he had a conversation with FBI Agent Cole regarding information about "the possibility" that someone other than appellant may have committed the murder. Captain Arriazola stated this information was "uncorroborated" and "purely speculative." Agent Cole told Captain Arriazola he would provide a detailed report with that information. Captain Arriazola received "some reports" from Agent Cole but he did not have them with him when he testified at trial. Even assuming defense counsel's failure to obtain the FBI reports amounted to deficient performance, appellant has failed to show there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694.

---

[17] Appellant does not specify as to what exculpatory evidence he is referring.

*f. Failure to Make a Bill of Exceptions*

Appellant argues defense counsel was ineffective for failing to make a "bill of review"[18] to preserve error. After the State nearly ended its direct-examination of Martinez, defense counsel told the trial court he wanted to ask Martinez about TS meetings in 2005 that "dealt with sanctions on Javier Lara."[19] The trial court denied this request, but agreed to let counsel make a bill of exceptions. No bill was ever made. Even assuming counsel's failure to make a bill amounted to deficient performance, appellant has failed to show there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *See id.*

*g. Self-Defense Instruction*

Appellant argues defense counsel was ineffective for failing to request any jury instruction on the issue of self-defense. In general, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2008). Further, a defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). However, "if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the accused is not entitled to an instruction on the issue." *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Williams v. State*, 35 S.W.3d 783, 787 (Tex.

---

[18]We interpret appellant's argument to mean that defense counsel was ineffective for failing to make a bill of exceptions.

[19]Captain Arriazola testified on cross-examination he had received information Javier Lara was an FBI informant.

App.–Beaumont 2001, pet. ref'd). The evidence showed that when investigators found Molina's body, he had a knife in his right hand. Martinez testified that when appellant was in the process of getting Molina out of the pickup on Pleasant Green Road, "[t]here was a struggle right there. . . ." This evidence, viewed in the light most favorable to appellant, does not show appellant reasonably believed that force was immediately necessary to protect himself against Molina's use or attempted use of unlawful force. Rather, the evidence showed appellant sought either an explanation from or a discussion with Molina concerning Molina's passing of information to Vasquez. Appellant and the other gang members took Molina to Pleasant Green Road in order to discipline him. Molina was shot by appellant, who was unlawfully carrying one of the murder weapons.[20] Thus, appellant was not justified in using deadly force against Molina. *See Johnson v. State*, 157 S.W.3d 48, 50 (Tex. App.–Waco 2004, no pet.) (stating "no error is shown in the denial of a defensive instruction if the evidence establishes as a matter of law that the defendant is not entitled to rely on this defense"); *Williams*, 35 S.W.3d at 786-87 [21]; *see also* TEX. PENAL CODE ANN. § 9.31(b)(5) (Vernon Supp. 2008) (providing self-defense not justified if

---

[20] Section 46.02 of the penal code-Unlawful Carrying Weapons--provides, in relevant part:

(a) A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun, . . . if the person is not:

(1) on the person's own premises or premises under the person's control; or

(2) inside of or directly en route to a motor vehicle that is owned by the person or under the person's control.

TEX. PENAL CODE ANN. § 46.02(a)(1), (2) (Vernon Supp. 2009). Here, the evidence showed appellant, while standing along side Pleasant Green Road and not inside of or directly en route to a motor vehicle, shot Molina with a handgun. Therefore, at the time he shot Molina, he was unlawfully carrying a weapon. *See id*.

[21] In *Williams*, the court found no error in the denial of a self-defense instruction when the accused intentionally sought out the victim to discuss their differences while unlawfully armed with a handgun. *See Williams v. State*, 35 S.W.3d 783, 786-87 (Tex. App.–Beaumont 2001, pet. ref'd).

defendant seeks out victim to discuss differences while unlawfully carrying a weapon). Therefore, appellant has not shown defense counsel's performance in failing to request a self-defense instruction fell below an objective standard of reasonableness nor has he shown a reasonable probability exists that, but for counsel's alleged error, the result would have been different. *See Strickland*, 466 U.S. at 687-88. Issue four is overruled.

*E. Speedy Trial*

In issue five, appellant complains he was denied his right to a speedy trial. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10.[22] On May 22, 2007, the day the State began its case-in-chief, the trial court held a hearing[23] on appellant's motion for a speedy trial.

During this hearing, defense counsel told the trial court, "This is a two-year old–more than a two-year-old case now and I believe that the defendant's rights to a speedy trial have been also violated because of the delay in bringing this matter to trial in Victoria County." No testimony or evidence was offered at this hearing. The trial court denied the motion.

*1. Standard of Review*

When reviewing the trial court's ruling on a speedy-trial motion, we use a bifurcated standard of review. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008). We

---

[22] Article I, section 10 of the Texas Constitution also guarantees the accused in all criminal cases the right to a speedy and public trial. *See* TEX. CONST. art I, § 10. This right exists independently of the federal guarantee, but the court of criminal appeals analyzes claims of a denial of the state speedy-trial right under the same four *Barker* factors. *Cantu v. State*, 253 S.W.3d 273, 280 n.16 (Tex. Crim. App. 2008).

[23] Article 27.10 of the code of criminal procedure mandates that "All motions to set aside an indictment . . . shall be in writing." TEX. CODE CRIM. PROC. ANN. art. 27.10 (Vernon 2006). Section 2 of article 28.01 requires that "matters not raised or filed seven days before the hearing will not thereafter be allowed to be raised or filed, except by permission of the court for good cause shown." *Id*. art. 28.01, § 2. Appellant's speedy-trial motion was orally made and was untimely because it was never raised until after the trial had started. However, these arguments were not presented to the trial court, and no objection was ever made. Therefore, the State waived those objections. TEX. R. APP. P. 33.1(a); *Martinez v. State*, 91 S.W.3d 331, 335-36 (Tex. Crim. App. 2002).

apply "an abuse-of-discretion standard for factual components, and a *de novo* standard for the legal components." *Id.* Those standards are well established, and a detailed recitation of them need not be repeated here. It is sufficient to note that the trial court's ruling will be affirmed only if it is supported by the record and is correct under the applicable law. *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003). When, as here, the trial court does not make written findings of fact and conclusions of law, findings supported by evidence will be implied in favor of the trial court's ruling, and we must defer to such findings. *See State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999).

*2. Applicable Law*

The Sixth Amendment to the United States Constitution guarantees the accused in a criminal case the right to a speedy trial. *Cantu*, 253 S.W.3d at 280. The right to a speedy trial

> "attaches once a person becomes an 'accused,' [i.e.,] once he or she is arrested or charged. Supreme Court precedent requires [us] to analyze federal constitutional speedy-trial claims 'on an ad hoc basis' by first weighing and then balancing the four *Barker v. Wingo* factors: (1) length of the delay[;] (2) reason for the delay[;] (3) assertion of the right[;] and (4) prejudice [24] to the accused. While the State has the burden of justifying the length of the delay, the [accused] bears the burden of proving the assertion of the right and showing prejudice. The [accused's] burden of proof on the latter two [*Barker*] factors 'varies inversely' with the State's degree of culpability for the delay."

*Id*. (citing *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less [an accused] must show actual prejudice or prove diligence in asserting [the] right to a speedy trial." *Id*. at 280-81.

---

[24] *See Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973) (stating that "if an accused made a prima facie showing of prejudice, the State 'must carry the obligation of proving that the accused suffered no serious prejudice beyond that which ensured from the ordinary and inevitable delay'").

"Once the *Barker* test is triggered, courts must analyze the speedy-trial claim by first weighing the strength of each of the *Barker* factors and then balancing their relative weights in light of 'the conduct of both the prosecution and the defendant.'" *Cantu*, 253 S.W.3d at 281 (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). No single "factor is 'either a necessary or sufficient condition to the finding of a deprivation of the'" speedy-trial right; rather, "the four factors are related and must be considered together along with any other relevant circumstances." *Id*. Because no factor has "'talismanic'" qualities, we must engage "'in a difficult and sensitive balancing process'" in each case. *Id*. (quoting *Barker*, 407 U.S. at 533).

"Upon a finding that an accused's Sixth Amendment speedy-trial right was actually violated, . . . dismissal of the charging instrument with prejudice is mandated." *Id*. "Because dismissal of the charges is a radical remedy, a wooden application of the *Barker* factors would infringe upon 'the societal interest in trying people accused of crime, rather than granting them immunization because of legal error.'" *Id*. (quoting *United States v. Ewell*, 383 U.S. 116, 121 (1966)). Thus, we "must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that [an accused's] actual and asserted interest in a speedy trial has been infringed." *Id*.; *see Barker*, 407 U.S. at 534-35 (finding a five-year delay did not violate the speedy-trial requirement when the record showed the accused did not want a speedy trial). "The constitutional right is that of a speedy trial, not dismissal of the charges." *Id*.

*3. Analysis*

*a. First Barker Factor: Length of the Delay*

The first *Barker* factor is measured from the time the accused is arrested or formally charged until the time the accused asserted the speedy-trial right. *United States v. Marion*, 404 U.S. 307, 321 (1971); *see Cantu*, 253 S.W.3d at 280.

*i. Time of Arrest*

The record is unclear regarding when appellant was arrested. At a pretrial hearing held in Victoria County on April 18, 2007, appellant told the trial court he had been in custody "[t]wo-and-a-half years." However, this statement does not accurately reflect the time which he was in custody for Molina's murder. Counting back two and one-half years from April 18, 2007, appellant would have been in custody since October 18, 2004. Two witnesses, Martinez and Vasquez, placed him in Victoria County prior to the murder. Captain Arriazola testified that after the murder, appellant turned himself in at Corpus Christi. If appellant had been in custody for two and one-half years, he was not in custody during that entire period for Molina's murder, which did not occur until April 24, 2005.

*ii. Time of Formal Charges*

On October 6, 2005, a Nueces County grand jury indicted appellant for Molina's murder. Approximately nineteen and one-half months later, appellant first asserted his right to a speedy trial on May 22, 2007.

*iii. Analysis*

"The *Barker* test is triggered by a delay which is unreasonable enough to be 'presumptively prejudicial.'" *Cantu*, 253 S.W.3d at 281 (citing *Doggett*, 505 U.S. at 652 n.1). No set time element exists that triggers the analysis, but the court of criminal appeals has

36

held that a four-month delay is not sufficient while a seventeen-month delay is. *Id*. In *Doggett*, the Supreme Court noted that courts "have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." 505 U.S. at 652 n.1. In this case, approximately nineteen and one-half months elapsed from the time appellant was indicted until the time he asserted his speedy-trial right. Therefore, we conclude the delay was presumptively prejudicial, thereby resolving the first factor in appellant's favor and warranting analysis of the three remaining *Barker* factors.

*b. Second Barker Factor: Reason for the Delay*

When the delay is determined to be presumptively prejudicial, the burden shifts to the State to justify the delay. *Turner v. State*, 545 S.W.2d 133, 137-38 (Tex. Crim. App. 1976). Under *Barker*, "different weights" should be attributed to this factor depending upon the different reasons for the delay. 407 U.S. at 531; *Munoz*, 991 S.W.2d at 822. A "'deliberate attempt to delay the trial'" weighs heavily against the State, whereas a "'more neutral reason such as negligence or overcrowded courts should be weighed'" less heavily against the State. *Munoz*, 922 S.W.2d at 822 (quoting *Barker*, 407 U.S. at 531). "A valid reason for the delay should not be weighed against the State." *Id*.

Here, the record shows that the State did not receive Tim Counce's ballistics report until May 21, 2007, one day before the State began its case-in-chief.[25] The report was important to the State's case because it corroborated Martinez's testimony that he and appellant shot Molina with different nine-millimeter weapons. At a pretrial hearing on March 21, 2007, about two months before trial began, defense counsel told the trial court

---

[25] In his appellate brief, appellant acknowledges that "although the evidence was furnished to the DPS lab on May 12, 2005, the firearms report was not finished until May 21, 2007, being the day prior to trial."

that "[n]either side is ready" and asked for trial announcements to be set on May 18. There is nothing in the record to show the State deliberately delayed the case. Under these circumstances, we conclude the delay was not a deliberate attempt to delay the trial.

### c. Third Barker Factor: Assertion of the Speedy-Trial Right

Appellant does not argue, and the record does not show, that he asserted his right to a speedy trial prior to May 22, 2007. The accused bears the responsibility to assert[26] his or her right to a speedy trial. *Cantu*, 253 S.W.3d at 282. "'The more serious the deprivation, the more likely a defendant is to complain.'" *Id*. at 283 (quoting *Barker*, 407 U.S. at 531). An accused's assertion of his or her speedy-trial right (or the failure to assert the right) "is entitled to strong evidentiary weight in determining whether the [accused] is being deprived of the right." *Id*.; *Harris v. State*, 827 S.W.2d 949, 957 (Tex. Crim. App. 1992) ("[A]ppellant's lack of a timely demand for a speedy trial indicates strongly that he did not really want a speedy trial."); *see Barker*, 407 U.S. at 536 ("[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial."). As the Fifth Circuit stated in *United States v. Palmer*, "the point at which the defendant asserts his right is important because it may reflect the seriousness of the personal prejudice he is suffering." 537 F.2d 1287, 1288 (5th Cir. 1976).[27] We conclude this factor weighs against appellant.

---

[26] Although a person cannot file a speedy-trial motion until formal charges are made, the person can assert his or her speedy-trial right in other ways. *Cantu*, 253 S.W.3d at 283. The United State's Supreme Court has held that "invocation of the speedy trial provision . . . need not await indictment, information, or other formal charge." *Dillingham v. United States*, 423 U.S. 64, 65 (1975).

[27] In *Palmer*, the court noted that because the defendant "first asserted his right thirty months after his arrest, which was one month after he first received notification of his indictment, and he complained at that time only of the 22-month pre-indictment delay," his "silence during the entire pre-indictment period works

38

*d. The Fourth Barker Factor:  Prejudice*

"Because 'pretrial delay is often both inevitable and wholly justifiable,' the fourth *Barker* factor examines whether and to what extent the delay had prejudiced the defendant."  *Cantu*, 253 S.W.3d at 285 (quoting *Doggett*, 505 U.S. at 656).  In analyzing the prejudice to the accused, we must do so in light of the accused's "interests that the speedy-trial right was designed to protect:  (1) to prevent oppressive pretrial incarceration[;] (2) to minimize the accused's anxiety and concern[;] and (3) to limit the possibility that the accused's defense will be impaired."  *Id*. (citing *Dragoo v. State*, 96 S.W.3d 308, 316 (Tex. Crim. App. 2003) (citing *Barker*, 407 U.S. at 532)).  Of these three types of prejudice, "the last is the most serious 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'"  *Id*. (quoting *Dragoo*, 96 S.W.3d at 316).

Although "a showing of 'actual prejudice' is not required in Texas," the accused has the burden to make some showing of prejudice that was caused by the delay of the trial. *Harris v. State*, 489 S.W.2d 303, 308 (Tex. Crim. App. 1973) (quoting *Courtney v. State*, 472 S.W.2d 151, 154 (Tex. Crim. App. 1971)).  Here, at the hearing on the speedy-trial motion, defense counsel did not argue the delay impaired appellant's defense, caused appellant to suffer anxiety and concern, or caused oppressive pretrial incarceration.  In his appellate brief, appellant does not argue he suffered any prejudice because of the delay. Because appellant made no showing of prejudice, the burden never shifted to the State to negate prejudice.  *See Harlan v. State*, 975 S.W.2d 387, 390 (Tex. App.–Tyler 1998, pet. ref'd).

---

against him because it suggests that any hardships he suffered were either minimal or caused by other factors."  *United States v. Palmer*, 537 F.2d 1287, 1288 (5th Cir. 1976).

Unlike the situation in *Zamorano v. State*,[28] appellant was not required to make numerous fruitless and costly trips to court,[29] he did not lose wages or time away from work,[30] and he did not long suffer as a result of public opprobrium by a lengthy pendency of formal criminal charges against him.[31]  In *State v. Burckhardt*, the appellate court held that the defendant's evidence of loss of "some potentially exculpatory evidence" and "several thousand dollars in income" was sufficient to show prejudice.  952 S.W.2d 100, 103 (Tex. App.–San Antonio 1997, no pet.).  In *Stock v. State*, prejudice was shown by the defendant's one-year pretrial incarceration, "interference with his employment prospects," and the burdensome "economic costs and inconvenience of traveling back and forth for urinalyses and trial settings."  214 S.W.3d 761, 766-67 (Tex. App.–Austin 2007, no pet.).  In each of these cases, at least one of the factual "major evils protected against by the speedy trial guarantee" stated in *United States v. Marion*[32] was present, i.e., disruption in employment or drainage of financial resources.  Except for some degree of personal anxiety,[33] none of the factors are present in this case.  We conclude this factor weighs

---

[28] 84 S.W.3d 643 (Tex. Crim. App. 2002).

[29] *Id*. at 650, 654 (noting twenty-two resets of pending case and at least eleven days of missing work due to court appearances).

[30] *Id*. at 654 (noting defendant, a day-laborer, suffered at least $1,320 in lost wages from making fruitless court appearances).

[31] *Id*. (noting four-year delay while formal charges were pending).

[32] 404 U.S. 307, 320 (1971) ("[T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. . . .  Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.").

[33] The court of criminal appeals has held that "general anxiety 'is at least some evidence of the type of 'anxiety' that the Supreme Court considers under the prejudice prong of *Barker*.'"  *Cantu*, 253 S.W.3d at 265-86. However, even if appellant had presented evidence of generalized anxiety, this evidence would not be sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern

40

against appellant.

### 3. Balancing the Factors

The record in this case supports the trial court's denial of appellant's speedy-trial motion. The tardiness of appellant's assertion of his speedy-trial right coupled with the lack of any substantial personal or defense prejudice resulting from the delay shows the trial court did not err in denying appellant's motion for a speedy trial. We hold appellant was not denied his right to a speedy trial. Issue five is overruled.

### F. Violation of Due Process--Selection of Jurors in Victoria County

In issue six, appellant argues his right to due process of law under the United States and Texas Constitutions was violated because the process for summoning, empaneling, and selecting jurors in this case excluded "young persons" from the venire. *See* U.S. CONST. amend VI; TEX. CONST. art. I, § 19. On March 19, 2007, defense counsel filed a "PRELIMINARY MOTION TO REQUIRE THE JURY VENIRE TO BE EMPANELED IN A MANNER THAT DOES NOT VIOLATE DEFENDANT'S CONSTITUTIONAL RIGHTS," which alleged, in relevant part, that "young persons are systematically excluded from jury service by application of Section 62.106 of the Texas Government Code."[34] Section

---

beyond the level normally associated with a criminal charge or investigation. *See id*.

[34] The motion expanded on this assertion as follows:

> Persons who "claim" to have children under the age of ten, and who "claim" that jury service would require leaving the child without adequate supervision, or persons who "claim" to be students are excused from jury service prior to voir dire. The Defense has no opportunity to examine these potential jurors prior to their dismissal. To the best knowledge of the undersigned, NO check is made, other than a statement from the potential juror, to assure that the potential juror is in fact a "person having legal custody of a child or children younger than 10 years of age and service on the jury would require leaving the child or children without adequate supervision" or that such person is a "student". This further depletes the number of young persons who are available for voir dire making it extremely

62.106(a)(2) of the government code provides a person may establish an exemption from jury service if the person "has legal custody of a child younger than 10 years of age and the person's service on the jury requires leaving the child without adequate supervision." TEX. GOV'T CODE ANN. § 62.106(a)(2) (Vernon 2005). In his brief, appellant argues that the section 62.106(a)(2) exemption "discriminated against your Appellant in that the process excluded Hispanics between the age of 18 and 35 from service as jurors in this case." Appellant concedes the trial court never ruled on the motion.

As previously stated in issue four, the Sixth Amendment entitles every defendant to a petit jury drawn from a source fairly representative of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). The "Texas Constitution provides the same protection as the federal constitution with [respect] to an impartial jury" drawn from a source "made up of a fair cross section of the community." *Marquez v. State*, 725 S.W.2d 217, 243 (Tex. Crim. App. 1987). There is no requirement, however, that the petit jury "actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 533. The only requirement is that "the jury wheels, pools of names, panels, or venires from which jurors are drawn must not systematically exclude distinctive groups, and [thus] fail to be reasonably representative." *Id.* at 538; *see Holland v. Illinois*, 493 U.S. 474, 482-83 (1990) (reiterating that the fair cross section requirement

---

easy for the State to exclude, most, if not all, young people from the jury. This is a violation of the constitution[al] guarantees of the Sixth Amendment and is especially so in any case where the Defendant is between the ages of 18 and 35[.] Juries in Victoria County are all most always comprised of persons over the age of 35, who are predominantly white, white collar, teachers, or retired plant workers. . . .

42

did not apply to the petit jury).

In *Pondexter,* the court instructed that to establish a prima-facie violation of the fair cross section requirement, an accused must show: (1) the group to be "excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due" to the group's systematic exclusion in the jury-selection process. 942 S.W.2d at 580; *see Duren*, 439 U.S. at 364. In this case, there was no evidence presented that the representation of Hispanics between the age of 18 and 35 in the venire from which petit juries are selected was not fair and reasonable in relation to the number of such persons in the community, nor was there any evidence that any such under representation was because of systematic exclusion of Hispanics in that age group from the jury-selection process. We hold appellant has not established a prima-facie violation of the fair cross section requirement. Issue six is overruled.

## G. Violation of Due Process–Trial Court's Denial of Motion to Remove the Electronic Restraining Device

In issue seven, appellant argues his right to due process was violated because he had to wear an electronic restraining device called a "Bandit" during trial. Under the Due Process Clause of the Fourteenth Amendment, an accused has the right to the presumption of innocence, i.e., the right to be free from criminal conviction unless the prosecution can prove his or her guilt beyond a reasonable doubt by probative evidence adduced at trial. *Andrade v. State*, 246 S.W.3d 217, 228 (Tex. App.–Houston [14th Dist.] 2007, pet. ref'd) (citing *Miles v. State*, 204 S.W.3d 822, 825 (Tex. Crim. App. 2006)).

43

When the jury sees the defendant in restraints, his or her "constitutional presumption of innocence is infringed." *Long v. State*, 823 S.W.3d 259, 282 (Tex. Crim. App. 1991). All efforts should be maintained to keep the jury from seeing the defendant in restraints, except when there is a showing of exceptional circumstances or a manifest need for the restraint. *Id*. The trial court has discretion to decide whether a defendant shall be tried in restraints. *Id*. "On appeal, the appellate court determines whether the trial court abused its discretion by requiring the defendant to appear in restraints." *Id*. To help the appellate court in this determination, the record must clearly and affirmatively reflect the trial court's reasons therefor. *Id*.

During the State's case-in-chief, but outside the jury's presence, defense counsel told the trial court appellant was "presently banded" and requested that the electronic restraining device be removed from appellant. Outside the jury's presence, the court held a hearing on counsel's request to remove the device. At this hearing, the prosecutor told the trial court, "I want the record to reflect that the Bandit is underneath his [appellant's] clothing, you cannot see the Bandit, nobody is aware that it is even visible." The State called as a witness, Kelvin Allen, a corporal with the Victoria County Sheriff's Department. He testified that the electronic device worn by appellant was called a "Bandit" and was used on individuals in order to maintain control of the person in the courtroom. He stated "the device is placed next to the skin" and that "[i]f you're not looking for it you could easily not see it." He testified appellant was identified as a security threat because he was a TS member. Corporal Allen was not aware of any disruptive behavior by appellant in the jail or at any previous court proceedings. On cross-examination, when defense counsel asked Corporal Allen, "so . . . the sole basis for placing this Bandit on . . . [appellant] is because

44

he's alleged to be a member of or is labeled in the jail system as being a member of the Texas Syndicate?", he replied:

> That's not the only reason. . . . Well, for his safety as well as our safety. In the advent [sic] that there's a situation that occurs within the courtroom, such as possibly—not saying that it would happen—but if family members were to get into some sort of ruckus, will probably assure him being a family member of one side of that possibly would want to assist them, that device would help us in deterring him from going to their aid.

There was no evidence that: (1) the Bandit was visible to the jury; (2) any juror had seen it; or (3) it interfered with appellant's ability to confer with his attorney. After hearing testimony, the trial court denied counsel's request to remove the Bandit from appellant. The trial court did not make specific findings of fact justifying the use of the Bandit.

In *Long*, the court of criminal appeals held that in the absence of evidence that the jury actually saw the restraints on the defendant, no reversible error existed. *Id*. at 283. There, the record was devoid of any evidence supporting the trial court's decision to restrain the defendant. *Id*. Even though the court of criminal appeals concluded the trial court abused its discretion in restraining the defendant during his trial, the court nevertheless held that, in the absence of evidence that the jury actually saw the restraints, the defendant was not harmed or prejudiced. *Id*.

In *Cooks v. State*, the defendant was restrained by a two-foot chain cuffing his feet and attached to an ankle bracelet. 844 S.W.2d 697, 722 (Tex. Crim. App. 1992). Cooks's attorney objected to the restraints and pointed to the lack of evidence that Cooks had acted in a way that would justify their use. *Id*. The trial court overruled the objection. *Id*. at 723. The court held that it did not need to decide if sufficient circumstances existed "to justify the court's action, because, even if the trial court did abuse its discretion in allowing

45

restraint of [the defendant], we cannot say that [the defendant] was harmed thereby. Absent evidence that the jury actually saw the shackles, we will not conclude that the defendant has been harmed." *Id*.

Since *Long* and *Cooks*, Texas courts have held that restraining a defendant during trial is harmful error when the restraints are detectable to the jurors or when the use of restraints impedes the defendant's ability to confer with defense counsel. *Taylor v. State*, 279 S.W.3d 818, 822 (Tex. App.–Eastland 2008, pet. ref'd); *Grant v. State*, 255 S.W.3d 642, 649 (Tex. App.–Beaumont 2007, no pet.).

Here, because the record is devoid of any evidence supporting the trial court's decision to restrain appellant, we conclude the trial court abused its discretion in restraining him during trial. *See Long*, 823 S.W.2d at 283. We hold, however, that this abuse of discretion did not harm him. Appellant does not direct us to any evidence in the record showing that any of the jurors saw the restraint or that the restraint impeded appellant's ability to confer with his attorney. In the absence of any evidence in the record showing that appellant's restraint was actually seen by the jury, or that it impeded his ability to confer with his attorney, we hold appellant was not harmed. *See Cooks*, 844 S.W.2d at 723 (holding that even if an abuse of discretion in authorizing restraint occurred, defendant was not harmed absent evidence the jury actually saw the restraint); *Taylor*, 279 S.W.3d at 821 (holding that when there is no evidence that restraint impeded defendant's ability to confer with counsel, its use is harmless). Issue seven is overruled.

### III. Conclusion

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and
filed this 2nd day of July, 2009.